E. MARTIN ESTRADA
United States Attorney
DAVID T. RYAN
Assistant United States Attorney
Chief, National Security Division
KATHRYNNE N. SEIDEN (Cal. Bar No. 310902)
Assistant United States Attorney
Deputy Chief, Terrorism and Export Crimes Section
ANNA P. BOYLAN (Cal. Bar No. 322791)
Assistant United States Attorney
Terrorism and Export Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0631/2170
    Facsimile: (213) 894-0141
    E-mail:   kathrynne.seiden@usdoj.gov
           anna.boylan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:18-759(A)-JLS-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE INTRODUCTION OF TESTIMONY BY DR. PETE SIMI AND SOCIAL MEDIA EVIDENCE |
| v. | |
| ROBERT BOMAN, | |
| Defendant. | Hearing Date: February 7, 2025<br>Hearing Time: 9:30 a.m.<br>Location:   Courtroom of the<br>          Hon. Josephine L.<br>          Staton |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kathrynne N. Seiden and Anna P. Boylan, hereby files its Opposition to defendant Robert Boman's ("defendant's") motion in limine to preclude introduction of testimony by Dr. Pete Simi and social media evidence.

1      This opposition is based upon the attached memorandum of points

2  and authorities, the files and records in this case, and such further

3  evidence and argument as the Court may permit.

4  Dated: January 17, 2024           Respectfully submitted,

5                                     E. MARTIN ESTRADA
                                      United States Attorney
6
                                      DAVID T. RYAN
7                                     Assistant United States Attorney
                                      Chief, National Security Division
8

9                                      */s/ Kathrynne Seiden*
                                      _____
10                                    KATHRYNNE N. SEIDEN
                                      ANNA P. BOYLAN
                                      Assistant United States Attorneys
11
                                      Attorneys for Plaintiff
12                                    UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.   INTRODUCTION...................................................1

II.  BACKGROUND......................................................2

     A.   Factual Background........................................2

          1.   Defendant's Participation in the Rise Above
               Movement............................................2

          2.   Defendant's Social Media Posts and Communications....3

     B.   Defendant's Prior Change-of-Plea Hearing.................3

     C.   The Government's Expert Disclosure.......................4

          1.   Dr. Simi's Proffered Opinions.......................4

          2.   The Basis for Dr. Simi's Opinions...................6

          3.   Dr. Simi's Qualifications...........................6

III. THE SOCIAL MEDIA EVIDENCE AND DR. SIMI'S TESTIMONY ARE
     RELEVANT AND HIGHLY PROBATIVE OF THE CHARGED CONDUCT..........8

IV.  THE SOCIAL MEDIA EVIDENCE IS NOT PROPENSITY EVIDENCE.........12

V.   DR. SIMI'S TESTIMONY IS HELPFUL, RELIABLE, AND BASED ON
     SUFFICIENT FACTS AND DATA....................................15

VI.  THE COURT NEED NOT HOLD A DAUBERT HEARING....................18

VII. CONCLUSION....................................................20

# **TABLE OF AUTHORITIES**

Page(s)

## **Cases**

Kumho Tire Co., Ltd. v. Carmichael,
  526 U.S. 137 (1999) .............................................. 15

United States v. Quintero,
  2022 WL 4021744 (C.D. Cal. Aug. 30, 2022) ...................... 19

United States v. Alatorre,
  222 F.3d 1098 (9th Cir. 2000) .................................. 19

United States v. Cervantes,
  2016 WL 491599 (N.D. Cal. Feb. 9, 2016) ..................... 17, 18

United States v. Cutler,
  806 F.2d 933 (9th Cir. 1986) ................................... 10

United States v. DeGeorge,
  380 F.3d 1203 (9th Cir. 2004) .................................. 14

United States v. Finley,
  301 F.3d 1000 (9th Cir. 2002) .............................. 15, 18

United States v. Hunt,
  534 F.Supp.3d 233 (E.D.N.Y. Apr. 15, 2021) ................. 11, 12

United States v. Jawara,
  474 F.3d 565 (9th Cir. 2007) ................................... 18

United States v. Mejia,
  545 F.3d 179 (2d Cir. 2008) .................................... 17

United States v. Ramirez-Jiminez,
  967 F.2d 1321 (9th Cir. 1992) .............................. 13, 14

United States v. Rundo,
  990 F.3d 709 (9th Cir. 2021) .................................... 9

United States v. Santiago,
  46 F.3d 885 (9th Cir. 1995) .................................... 14

United States v. Skillman,
  922 F.2d 1370 (9th Cir. 1990) .................................. 11

United States v. Vera,
  770 F.3d 1232 (9th Cir. 2014) .................................. 18

1

<u>United States v. Winslow</u>,
   962 F.2d 845 (9th Cir. 1992) ..................................... 10

2

3

**<u>Statutes</u>**

4

18 U.S.C. § 2101................................................ 9

5

18 U.S.C. § 371................................................ 2

6

**<u>Rules</u>**

7

Fed. R. Evid. 401............................................... 8

8

Fed. R. Evid. 403............................................... 8

9

Fed. R. Evid. 404........................................ 12, 13, 14

10

Fed. R. Evid. 702.............................................. 15

11

Fed R. Evid. 402............................................... 8

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    INTRODUCTION**

3      Defendant is charged with intentionally rioting and conspiring

4 to riot with fellow members of what the government contends was a

5 violent white supremacist organization.  The parties do not dispute

6 that defendant engaged in physical confrontations at various public

7 protests during the summer of 2017.  Thus, the key issue for the jury

8 to determine will be defendant's intent in doing so.  Apart from

9 defendant's conduct at the riots, the best evidence the jury will

10 have with which to decipher defendant's intent are his own words and

11 beliefs, which the government plans to admit in the form of messages

12 and posts defendant shared on his Facebook account.

13      Because most of those posts and messages include references,

14 symbols, and imagery whose meaning may not be obvious to a layperson,

15 the government has noticed an expert on the white supremacy movement

16 who can contextualize defendant's statements within that movement.

17 The government's proposed expert will help the jury in determining

18 defendant's intent by explaining that his evident belief system

19 conformed to the violent extremism that characterizes the white

20 supremacy movement.  Because that expert's views are based on decades

21 of fieldwork and academic study and are highly probative of the key

22 issue the jury must decide, the Court should deny defendant's motion

23 to exclude his testimony without a Daubert hearing.  The Court should

24 similarly deny defendant's motion to preclude the key evidence of the

25 major issue in this case: defendant's own social media posts and

26 messages.

27

28

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Defendant's Participation in the Rise Above Movement

The first superseding indictment ("FSI") charges that beginning in or around March 2017 and continuing until on or about May 2018, defendant conspired with Robert Rundo ("Rundo"), Tyler Laube ("Laube"), and others to riot and did riot, in violation of 18 U.S.C. §§ 371 and 2101.  (Dkt. 209 ¶ 5.)  Using text messages and the internet to coordinate combat training and their attendance at various rallies throughout the country, defendant and his co-conspirators then traveled to those rallies to engage in violence with individuals they identified as holding opposing political views.  (Id. ¶ 6.)  At the rallies, defendant and his co-conspirators engaged in violent altercations.  (Id.)  Afterwards, they used the internet to share videos and photographs of themselves and each other committing acts of violence to recruit more people to engage in violence at future events.  (Id.)  The FSI charges that defendant and his co-conspirators did this all as members of RAM, a combat-ready, militant white nationalist and supremacy movement.  (Id. ¶ 2.)

Defendant personally participated in two of those rallies, which occurred in Huntington Beach, California in March 2017 and in Berkeley, California in April 2017.  (Id. ¶ 7.)  His co-conspirators participated in additional rallies during the charged timeframe which defendant did not attend, including rallies in San Bernardino, California in June 2017 and Charlottesville, Virginia in August 2017. (Id.)  At each of the four rallies described in the FSI, defendant and/or his co-conspirators committed violent assaults against

counter-protestors or others who they believed opposed RAM's
ideology.

2.    Defendant's Social Media Posts and Communications

During the period of the charged conspiracy, defendant used his
Facebook account to brag about his violence at the rallies he
attended and to promulgate his white supremacist ideology.  Many of
those posts and messages facially relate to the charged conduct; for
example, in March 2017, just after the Huntington Beach rally,
defendant posted a link to an article titled "Trumpenkriegers
Physically Remove Antifa Homos in Huntington Beach" along with the
comment "we did it fam."  But defendant also made repeated statements
reflecting his antisemitic and white supremacist viewpoints: for
example, defendant's posts and messages contain repeated references
to the "alt-reich," "hail victory," Holocaust denial, "back of the
oven," "Dagoyim know," "leftist cucks," "red pilling," and the
crusades.  In addition to his explicit statements repeating or
discussing the above terms, defendant also shared various memes
reflective of his ideology, including illustrated images referencing
lynching and antisemitic tropes.  Defendant posted these and other
similar images on Facebook between March and August of 2017; in other
words, beginning around the time of the Huntington Beach rally and
continuing through the approximate time of the Charlottesville rally.

**B.    Defendant's Prior Change-of-Plea Hearing**

In February 2023, defendant signed a plea agreement in which he
admitted that he was a member of RAM and that he and his co-
conspirators agreed to attend rallies with the intent to commit acts
of violence in furtherance of rioting.  (Dkt. 216 ¶ 10.)  But at his
change-of-plea hearing, defendant denied that he attended the rallies

3

1   with "a mind to fight or [to] have an altercation," asserted that he

2   and his co-conspirators went to the rallies to protest and to act as

3   "security for the speakers," and painted his violence at the rallies

4   alternatively as self-defense and as motivated by his desire to

5   defend an 18-year-old minority being attacked by counter-protestors.

6   (Dkt. 238 at 26-29.)  Ultimately, defendant opted not to go through

7   with his guilty plea.  His trial is set for February 18, 2025.

8           **C.   The Government's Expert Disclosure**

9           On December 19, 2024, the parties met and conferred regarding,

10  among other things, the government's anticipated expert testimony.

11  On January 2, 2025, the government provided the written notice

12  attached as Exhibit A to defendant's motion.  (Dkt. 465-2.)

13               1.   <u>Dr. Simi's Proffered Opinions</u>

14          The government's 20-page notice outlines at length Dr. Pete

15  Simi's anticipated testimony.  Notably, the government anticipates

16  that Dr. Simi will give the jury an overview of the white supremacist

17  movement and how violence is inextricably intertwined with that

18  movement, which is premised on the notion that non-whites and "race

19  traitors" like Antifa pose an existential threat to the white race

20  that can only be resolved through violence.  (<u>Id.</u> at 8-14.)  Dr. Simi

21  will explain how the ideas embedded into the culture of the movement,

22  including the idea that threats are everywhere, prime participants to

23  engage in violence and imbue participants with the sense that

24  violence is justifiable self-defense.  (<u>Id.</u> at 11.)  He will further

25  opine that public confrontations provide an opportunity for members

26  of the white supremacist movement to trigger their enemies and ignite

27  large-scale conflicts that members of the movement see as inevitable.

28  (<u>Id.</u> at 10.)  Dr. Simi will also explain to the jury how participants

4

in the modern white supremacist movement use "double-speak," "front-
stage" and "back-stage" behavior, and social media to outwardly
rebrand their violent views as acceptable forms of politics in order
to neutralize public stigma, while privately reinforcing norms of
violence through exposure to hateful propaganda.  (Id. at 4-7.)

Dr. Simi will then explain to the jury that based on his review
of open source materials covering RAM's presence at the charged
rallies and RAM's social media accounts, public recruitment videos,
and its members' communications, RAM was not simply a fitness-
oriented fraternal order, but promoted through its propaganda,
attendance at rallies, and on and offline communications a white
supremacist agenda filtered through the lens of a warrior motif,
reimagining white supremacy as something more fashionable to young
adults.  (Id. at 14-16.)  Dr. Simi will explain to the jury the
historical references and meanings conveyed by the various messages,
symbols, and gestures displayed by RAM members (including defendant)
at the charged rallies and will further explain how those references
are hallmarks of the white supremacy movement.  (Dkt. 465-2 at 14-
16.)  And Dr. Simi will opine that RAM members not only subscribed to
a violent ideology, but also used their own violence at these rallies
to market themselves to the rest of the white supremacist movement.
(Id. at 16.)

Finally, Dr. Simi will explain that defendant's Facebook account
and messages with his co-conspirators, other white supremacists, and
members of the public reflect his immersion into white supremacist
culture and are consistent with him subscribing to a violent white
supremacist ideology.  (Id. at 17.)  In particular, Dr. Simi will
explain that defendant's various references to Nazi Germany, the

5

1  crusades, white genocide, and white supremacist outlets; his displays

2  of antisemitism and posts celebrating his own violence at the charged

3  protests; and his references to terms which may seem opaque to a jury

4  (such as being "red pilled" or "cucked") all make clear that

5  defendant held a violent extremist ideology which is compatible with

6  having been immersed in the white supremacist movement and which is

7  compatible with having committed violence at the public events he

8  attended in furtherance of that movement.

9          2.    The Basis for Dr. Simi's Opinions

10     Dr. Simi's opinions are based on his training and experience,

11 detailed below, as well as his review and observance of audio, video,

12 photographic, text, and social media evidence from RAM's own

13 Instagram and Twitter accounts and training videos, defendant's own

14 Facebook account, and communications between RAM members.  (Id. at

15 19-20.)  Dr. Simi has reviewed these materials through open sources,

16 evidence provided to him in this case, and through his engagement and

17 consultation on related court proceedings involving RAM, including a

18 federal civil matter related to the Charlottesville protest, in which

19 he testified.  (Id.)

20          3.    Dr. Simi's Qualifications

21     As explained more fully in the government's disclosure, Dr. Simi

22 has studied extremist groups and their violence for more than 25

23 years and has conducted extensive ethnographic fieldwork,[1] including

24 firsthand interviews with more than 200 current and former members of

25 domestic extremist groups from 27 states.  (Dkt. 465-2 at 20.)  His

26

27     [1] Ethnography can be defined as the systematic study of human
groups and human culture; it is a research strategy employed by
28 social scientists such as anthropologists and sociologists to collect
primary data through intensive interviews and observation.

research has been used in the Federal Bureau of Investigation

("FBI")'s National Training Academy to highlight the activity of

white supremacist groups and has been relied on by the United States

Congress and various federal and state law enforcement agencies for

training.  (Id.)

Attached to the government's disclosure was Dr. Simi's 28-page

curriculum vitae, which further documents Dr. Simi's extensive

experience and expertise in white supremacist groups and their

culture.  (Id. at 24-51.)  Dr. Simi has various relevant degrees,

including: a B.A. in Social Science; an M.A. in Sociology, for which

he wrote his thesis on white supremacy; and a Ph.D. in Sociology, for

which he produced a dissertation on skinhead subculture in Los

Angeles.  (Id. at 24.)  His decades in academia have included (but

are not limited to) tenures as the Director of Radicalization and

Violent Groups Research at the University of Nebraska, a visiting

professor at the University of Oslo's Center for Research on

Extremism, a member of the Executive Committee for National

Counterterrorism at the University of Nebraska, Omaha, and a

Professor in the Department of Sociology at Chapman University.

(Id.)  He has earned multiple certifications from the FBI's

Behavioral Science Unit, including as part of a working group on

radicalization and street gangs.  (Id.)  His published work is too

extensive to relay here, but includes books on extremist white

supremacy and the white power movement; nearly 40 peer-reviewed

articles on topics relating to violence and white supremacist

culture, including "How Threat Mobilizes the Resurgence and

Persistence of U.S. White Supremacist Activism," "A Constellation

Approach to Understanding Extremist White Supremacy," "More Than a

7

Joke: White Supremacist Humor as a Daily Form of Resistance," "On the
Permissibility of Homicidal Violence: Perspectives from Former US
White Supremacists," "The Culture of Violent Talk: An Interpretive
Approach," and "Understanding the Micro-Situational Dynamics of White
Supremacist Violence in the United States"; and more than 50 book
chapters and technical publications, including on neo-nazis and other
facets of the white supremacist movement, the alt-right, and violent
extremism.  (Dkt. 465-2 at 25-31.)  His research on extremism has
been funded by more than $5 million in grants, contracts, and
fellowships, and he has consulted as a legal expert in dozens of
matters, including testifying in a federal civil case arising from
the Charlottesville protest charged as part of the instant
conspiracy.  (Id. at 34-46.)

**III. THE SOCIAL MEDIA EVIDENCE AND DR. SIMI'S TESTIMONY ARE RELEVANT
AND HIGHLY PROBATIVE OF THE CHARGED CONDUCT**

The Court should admit defendant's social media posts and Dr.
Simi's testimony explaining those posts because that evidence is
relevant and highly probative of the primary determination the jury
will be asked to make.  "[A]ll relevant evidence is admissible."  Fed
R. Evid. 402.  Evidence is relevant if it has a "tendency to make the
existence of any fact that is of consequence to the determination of
the action more probable or less probable."  Fed. R. Evid. 401.
Relevant evidence should be admitted unless its "probative value is
substantially outweighed by the danger of unfair prejudice, confusing
the issues, misleading the jury, undue delay, wasting time, or
needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

Here, the jury will need to decide whether defendant used a
facility of interstate commerce with the intent to incite,
participate in, or commit an act of violence in furtherance of a

8

1    riot, and whether he committed an overt for the purpose of rioting.

2    See 18 U.S.C. § 2101; see also United States v. Rundo, 990 F.3d 709,

3    720-21 (9th Cir. 2021).  Based on the plain language of the statute,

4    defendant's intent is paramount to that determination.  The jury

5    cannot be expected to discern defendant's intent in a vacuum; rather,

6    his own words during the relevant timeframe provide critical insight

7    into what he was thinking when he attended politically charged

8    rallies and repeatedly engaged in physical altercations with

9    attendees holding opposing viewpoints.

10        Dr. Simi's testimony further underscores why defendant's posts

11   and messages are relevant because it helps to contextualize

12   references whose connection to the charged conduct may not be obvious

13   to a layperson.  For example, defendant's antisemitism may appear to

14   the average person to bear little relation to his conduct at

15   Huntington Beach or Berkeley, but Dr. Simi will explain that those

16   views are embedded in the white supremacy movement and motivate its

17   members to engage in violence.  Specifically, Dr. Simi will explain

18   that white supremacists believe in a Jewish conspiracy to control

19   world affairs and that to a white supremacist, such a conspiracy

20   poses an existential threat to the white race.  In Dr. Simi's

21   opinion, those beliefs lead white supremacists to view acts of

22   intentional violence against their political opponents as necessary

23   and justifiable.  That testimony is highly relevant to whether

24   defendant intentionally engaged in violence at the protests he

25   attended, or rather, as he has already claimed, attended the rallies

26   without any intention to engage in physical altercations and only did

27   so because he saw a minority being attacked.

28

1    The proffered evidence is also relevant because it helps explain

2    the conspiracy defendant is charged with joining.  Specifically,

3    defendant is charged with having agreed to riot with other members of

4    a particular group.  Establishing that the group had shared goals

5    based on their unifying ideals and that defendant himself held those

6    ideals is highly probative of whether he entered into an agreement to

7    commit particular acts in furtherance of the group's agenda.  See

8    United States v. Winslow, 962 F.2d 845, 850 (9th Cir. 1992)

9    (admitting testimony on Aryan Nation as relevant to bombing of gay

10   bar by group members); United States v. Cutler, 806 F.2d 933, 936

11   (9th Cir. 1986) (admitting evidence of affiliation with Aryan Nation

12   to show the defendant's motive to hire hit man to kill persons who

13   might testify against the group).

14   Defendant claims that the social media evidence and Dr. Simi's

15   testimony should be excluded as irrelevant because they concern his

16   motivation to commit the charged offenses, which defendant claims is

17   "irrelevant to the issue of whether the defendant actually committed

18   the alleged offenses."  (Def. Mot., Dkt. 465 ("Mot.") at 4.)  The

19   proposition that a defendant's motive to commit a crime is irrelevant

20   to whether he did so intentionally flies in the face of common sense

21   and the established law of this Circuit.  See Cutler, 806 F.2d at

22   936.  To the extent defendant's posts make clear that he had an

23   actual motive to engage in physical altercations, it makes it

24   significantly more likely that his conduct was intentional.  The

25   posts are therefore highly relevant.

26   Finally, defendant claims that his social media posts should be

27   excluded under Rule 403 because they are prejudicial and risk

28   confusing and misleading the jury.  (Mot. at 6.)  However, as the

10

Ninth Circuit has made clear, prejudice alone is insufficient to preclude the admission of otherwise relevant evidence; a district court only has discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. United States v. Skillman, 922 F.2d 1370, 1374 (9th Cir. 1990). Evidence establishing racial animus is not unfairly prejudicial where that animus is relevant to defendant's motivation for engaging in the charged conduct. See id. (admitting testimony, over Rule 403 objection, that the defendant asked to attend a "skinhead" picnic as relevant on issue of racial animus in civil rights case).

Defendant relies exclusively on an out-of-district case in which the Eastern District of New York excluded certain evidence as irrelevant and unfairly prejudicial under Rule 403, but that case supports the government's position. There, the defendant was indicted for threatening to assault and murder members of the U.S. Congress. United States v. Hunt, 534 F.Supp.3d 233, 239 (E.D.N.Y. Apr. 15, 2021). The court excluded text exchanges with the defendant's cousin and father reflecting that he was a violent person, but which otherwise had no relationship, temporally or substantively, to the statements or events at issue in the case. Id. at 252-53. But the court admitted significant evidence reflecting the defendant's antisemitic and white supremacist beliefs. Although the court acknowledged that evidence about those beliefs could be unduly prejudicial if it "extend[ed] beyond explaining the references in his alleged threats," id. at 247-48, it nonetheless admitted the majority of the government's proffered evidence reflecting them, including: antisemitic text messages around the time of the election;

11

1   references to the writings of Adolf Hitler; portions of a manifesto

2   making references to "88", "14," and other anti-Semitic symbology;

3   and the defendant's browser history reflecting visits to a website

4   used to spread white supremacist and antisemitic propaganda.  Id. at

5   248-49.  The court found that the evidence about the defendant's

6   white supremacist and antisemitic beliefs was "probative of his

7   intent and knowledge" and could "bear on whether [the defendant]

8   wished to retaliate against public officials."  Id.

9        Here, like in Hunt, the evidence the government seeks to admit

10  is highly probative of his intent and of whether he had a motivation

11  to riot against those he viewed as his political enemies.  None of

12  the evidence the government seeks to admit is unnecessarily gruesome,

13  graphic, or otherwise "unfairly" prejudicial; rather, the evidence

14  consists of cursory phrases, symbols, or illustrated internet memes

15  which are highly probative of defendant's state of mind during the

16  charged conspiracy.  The Court should not exclude evidence that can

17  give the jury an accurate sense of defendant's ideology, and thus his

18  intent in attending highly charged political rallies.  To do so would

19  be to mislead the jury.

20  **IV.  THE SOCIAL MEDIA EVIDENCE IS NOT PROPENSITY EVIDENCE**

21       Defendant further claims that the evidence should be excluded as

22  impermissible character evidence under Rule 404(a) (Dkt. 465 at 4),

23  which provides that evidence of a person's "character or character

24  trait is not admissible to prove that on a particular occasion the

25  person acted in accordance with the character or trait."  Fed. R.

26  Evid. 404(a)(1).  Defendant's argument would hold weight if, for

27  example, the government wanted to call a witness to testify that

28  defendant has a reputation as a violent person, and such evidence

1  were only relevant to prove that he acted violently during the

2  charged rallies.  That is not the case here.  Defendant's own words

3  and postings during the charged conspiracy are not being offered as

4  evidence of defendant's character trait, but as evidence of his

5  motive and intent to riot.  Moreover, some of the posts are also

6  admissible because they are themselves instances of defendant using a

7  facility of interstate commerce with the intent to incite a riot.  In

8  other words, defendant's posts and messages immediately preceding the

9  Berkeley rally are not only relevant because they shed light on his

10  mental state once he was physically present at the Berkeley rally,

11  but also because they are direct examples of defendant committing the

12  crime with which he is charged.

13      Defendant also points to Rule 404(b) as precluding admission of

14  his social media posts, but that rule does not help him, either.

15  Under Rule 404(b), evidence of any <u>other</u> crime, wrong, or act is not

16  admissible to prove a person's character in order to show that on a

17  particular occasion, the person acted in accordance with that

18  character.  Fed. R. Evid. 404(b)(1).  But "evidence should not be

19  treated as other crime evidence when the evidence concerning the act

20  and the evidence concerning the crime charged are inextricably

21  intertwined."  <u>United States v. Ramirez-Jiminez</u>, 967 F.2d 1321, 1327

22  (9th Cir. 1992).  "In such cases, the policies supporting the

23  exclusion of evidence under Rule 404(b) are inapplicable, since the

24  evidence is not being presented to 'prove the character of a person

25  in order to show action in conformity therewith.'"  <u>Id.</u>  "Instead,

26  the evidence is 'direct evidence,' used to flesh out the

27  circumstances surrounding the crime with which the defendant has been

28  charged, thereby allowing the jury to make sense of the [evidence] in

1    its proper context."  Id.  Here, defendant's social media posts,

2    which he made during the period of the charged conspiracy, are not

3    evidence of some other crime, wrong, or act; rather, they are

4    admissions about his motivation to engage in the charged conduct, and

5    are thus exempt from a Rule 404(b) analysis.  See id. (finding false

6    statements made during the course of the defendant's arrest were not

7    subject to Rule 404(b) analysis); see also United States v. DeGeorge,

8    380 F.3d 1203, 1220 (9th Cir. 2004) (holding evidence of prior acts

9    are not subject to a Rule 404(b) analysis where the evidence

10   "constitutes a part of the transaction that serves as the basis for

11   the criminal charge"); United States v. Santiago, 46 F.3d 885, 889

12   (9th Cir. 1995) (finding that evidence of gang links to the planning

13   of the crime was not "other crimes" evidence subject to Rule 404(b)

14   where it related directly to the crime for which the defendant was

15   invited and the record "reveal[ed] no evidence of any specific,

16   wrongful acts by either the Mexican Mafia or [the defendant] that are

17   unrelated to the [charged] murder").

18       Even if defendant's social media posts were subject to a 404(b)

19   analysis, they would be admissible under Rule 404(b)(2), which allows

20   the admission of other act evidence which is used to prove motive,

21   opportunity, intent, preparation, plan, knowledge, identity, absence

22   of mistake, or lack of accident.  Fed. R. Evid. 404(b)(2).  As stated

23   above, the government seeks to admit defendant's posts and messages -

24   - which either directly comment on the charged conduct or else

25   reflect defendant's immersion into and commitment to the white

26   supremacist movement and its violent extremist ideology -- to prove

27   defendant's intention to and motive for rioting and to prove that the

28   physical altercations he engaged in were part of his and RAM's plan.

14

**V.    DR. SIMI'S TESTIMONY IS HELPFUL, RELIABLE, AND BASED ON
       SUFFICIENT FACTS AND DATA**

Dr. Simi's testimony is appropriate expert testimony under Rule 702, which allows a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to testify as an expert.  Fed. R. Evid. 702.  The expert's knowledge can be "scientific, technical, or other[wise] specialized," and as the Supreme Court has explained, there are "many different kinds of expertise."  Fed. R. Evid. 702(a); <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 150 (1999).

Defendant argues that Dr. Simi's testimony should be excluded on three bases.  First, defendant claims Dr. Simi's testimony should be excluded because it will not help the jury to understand the evidence or determine a fact at issue.  (Mot. at 7.)  But as explained above, Dr. Simi's testimony will help the jury to understand the broader white supremacist movement, how white supremacists use violent, public confrontations to advance the agenda of that movement, and whether RAM was or was not a white supremacist group.  Those issues are relevant to whether or not RAM's members conspired to riot; that is, to engage in deliberate violence in public settings.  Dr. Simi's testimony will also help the jury to interpret defendant's use of language, symbols, and historical references, which shed light on defendant's state of mind and, specifically, whether or not he held beliefs that motivated him to engage in intentional acts of violence. Put simply, defendant's intent is the ultimate issue in this case, and Dr. Simi's testimony will help the jury understand and contextualize his intent.  <u>See e.g.</u> <u>United States v. Finley</u>, 301 F.3d 1000, 1013 (9th Cir. 2002) (finding that an expert who would have

15

helped the jury "interpret and assess" their own observations about a defendant's demeanor would have assisted the trier of fact and noting "[o]ur case law recognizes the importance of expert testimony when an issue appears to be within the parameters of a layperson's common sense, but in actuality, is beyond their knowledge.")

Second, defendant claims that Dr. Simi's testimony should be excluded because it is not based on sufficient facts and data. Specifically, defendant complains that Dr. Simi has not interviewed defendant or "gathered personalized information." (Mot. at 7.)  But the Court should not exclude Dr. Simi's testimony simply because he has not interviewed defendant; Dr. Simi is not, for example, a psychologist attempting to render a diagnosis of a defendant whom he has never treated.  Rather, Dr. Simi is an academic researcher who has conducted extensive ethnographic fieldwork and can recognize hallmarks of the white supremacy movement, including phrases, ideas, and symbols that permeate its culture, which he has encountered again and again through his work.  It is further immaterial whether Dr. Simi has "gathered personalized information" about defendant (Mot. at 7); even if Dr. Simi's testimony were cabined to general information about the white supremacy movement, Dr. Simi's ethnographic fieldwork would be sufficient to support generalized opinions about the white supremacy movement.  But it is also inaccurate to say that Dr. Simi has not "gathered personalized information"; to the contrary, as his expert notice reflects, Dr. Simi has reviewed not only extensive materials specific to RAM, but has also reviewed defendant's own messages and posts, which are "personalized information" reflective of defendant's state of mind and beliefs.  Accordingly, Dr. Simi's conclusions about defendant are based on sufficient facts and data.

To the extent defendant feels that Dr. Simi's lack of personal
interaction with defendant limits the value of his testimony,
defendant is free to probe that in his cross-examination and argue it
to the jury.

Third, defendant claims that Dr. Simi's testimony is speculative
and unreliable because his opinions are premised on the behavior and
characteristics of a "larger group of people" who "lack uniform or
clear characteristics." (Mot. at 7.)  That claim misconstrues Dr.
Simi's proffered opinion, which is that notwithstanding the
decentralization of the white supremacy movement, there are core
beliefs that unify and permeate its culture. (Dkt. 465-2 at 3-4
(noting Dr. Simi's opinion that "there is considerable overlap among
the branches of the [white supremacist movement ("WSM")], so
distinctions are often blurred"; "[a]ny single group may use symbols
or rituals from across different branches"; "spreading across the WSM
are its core racist beliefs," and "[e]ven where members belong to
different groups or networks, the common culture of the WSM binds
leader and members together in an understanding that all sectors will
fight together in . . . a coming race war").)

Defendant complains that Dr. Simi's opinion is unreliable for
the additional reason that it is premised on the behavior of a group
that "communicates in an opaque manner." (Mot. at 7.)  But as
another court in this Circuit has recognized, "[j]ust as an
anthropologist might be equipped by education and fieldwork to
testify to the cultural mores of a particular social group,
[witnesses] may be equipped by experience and training to speak to
the operation, symbols, jargon, and internal structure of criminal
organizations." United States v. Cervantes, 2016 WL 491599, at *4

1  (N.D. Cal. Feb. 9, 2016) (quoting United States v. Mejia, 545 F.3d

2  179, 190 (2d Cir. 2008)).  Similarly, in the context of drug

3  prosecutions, "officers may testify about their interpretations of

4  'commonly used drug jargon' based solely on their training and

5  experience."  United States v. Vera, 770 F.3d 1232, 1241 (9th Cir.

6  2014).

7        Here, Dr. Simi can rely on his training and experience,

8  including his decades of research and ethnographic fieldwork, to

9  illuminate for the jury the meaning of the symbols, references, and

10  terminology defendant describes as "opaque."  See Cervantes, 2016 WL

11  491599, at *4 (admitting "[o]pinions about the meaning of different

12  symbols associated with gang membership and the general means of

13  communication among gang members" where those opinions "appear to

14  stem from a synthesis of information from [the] officer's training

15  and investigation experience").  Moreover, the coded nature of

16  communications among white supremacists does not render unreliable

17  Dr. Simi's testimony, but rather, underscores the necessity of his

18  testimony in unraveling the meaning behind those opaque

19  communications.  See Finley, 301 F.3d at 1013 ("It is precisely

20  because juries are unlikely to know that social scientists and

21  psychologists have identified such a personality disorder . . . that

22  the testimony would have assisted the jury in making its decision.")

23  (internal alterations, quotations, and citation omitted).

24  **VI.   THE COURT NEED NOT HOLD A DAUBERT HEARING**

25        Although the district court has a general "gatekeeping" duty to

26  ensure proffered expert testimony "rests on a reliable foundation and

27  is relevant to the task at hand," that obligation does not "require

28  the court to hold a separate Daubert hearing."  United States v.

Jawara, 474 F.3d 565, 582-83 (9th Cir. 2007).  The Court does not need to hold a pretrial hearing to determine whether Dr. Simi is qualified or his testimony is reliable.  A court need not hold a hearing where a proposed expert's experience makes plain that he or she is qualified to testify on the subject matter for which he or she is noticed.  See e.g., United States v. Alatorre, 222 F.3d 1098, 1105 (9th Cir. 2000) (concluding pretrial hearing was not necessary before admission of agent's testimony on the value of marijuana where the agent had twelve years of experience and specialized training and the defendant would have the opportunity to "explore the relevance and reliability of the proposed testimony" at trial); United States v. Quintero, 2022 WL 4021744, at *20-21 (C.D. Cal. Aug. 30, 2022) (finding Daubert hearing was not necessary because the government's proposed expert witness had extensive experience investigating narcotics activity and had testified on substantially similar topics in the past).

Here, Dr. Simi has multiple advanced degrees relevant to his proffered testimony, 25 years of experience in academia focused on the subject of white supremacy and extremism, and significant ethnographic fieldwork.  He has also testified on substantially similar topics in the past, most notably in Sines v. Kessler, the civil suit arising from the Charlottesville rally charged as part of this case, in which he testified, among other things, about the "double-speak" or "just joking strategies" developed and used by white supremacists to conceal their racist or violent messages.  See Sines v. Kessler, No. 3:17-cv-00072 (W.D. Va. Apr. 15, 2021).  The Court can and should find that Dr. Simi's testimony is admissible without a Daubert hearing.

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to exclude evidence from defendant's social media account during the charged conspiracy and deny defendant's motion to exclude Dr. Simi's testimony without holding a Daubert hearing.