BILAL A. ESSAYLI
United States Attorney
DAVID T. RYAN
Assistant United States Attorney
Chief, National Security Division
KATHRYNNE N. SEIDEN (Cal. Bar No. 310902)
Deputy Chief, Terrorism and Export Crimes Section
ANNA P. BOYLAN (Cal. Bar No. 322791)
Assistant United States Attorneys
Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:    (213) 894-0631/2170
     Facsimile:    (213) 894-0140
     E-mail:   kathrynne.seiden@usdoj.gov
               anna.boylan@usdoj.gov

Attorneys for Applicant
UNITED STATES OF AMERICA

                 UNITED STATES DISTRICT COURT

            FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>ROBERT BOMAN,<br><br>          Defendant. | No. CR 2:18-759(A)-JLS-2<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT ROBERT BOMAN<br><br>Hearing Date: August 1, 2025<br>Hearing Time: 10:30 a.m.<br>Location:    Courtroom of the<br>             Hon. Josephine L.<br>             Staton |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Kathrynne N. Seiden

and Anna P. Boylan, hereby files its sentencing position for

defendant Robert Boman ("defendant").

//

//

//

//

This sentencing position is based upon the attached memorandum of points and authorities, the exhibits attached to the government's sentencing memorandum for co-defendant Robert Rundo (Dkt. 442), the government's admitted exhibits in the trial against defendant (Dkt. 500), the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: July 18, 2025                Respectfully submitted,

                                    BILAL A. ESSAYLI
                                    United States Attorney

                                    DAVID T. RYAN
                                    Assistant United States Attorney
                                    Chief, National Security Division

                                    */s/ Anna P. Boylan*
                                    _____
                                    ANNA P. BOYLAN
                                    KATHRYNNE N. SEIDEN
                                    Assistant United States Attorneys

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

# Table of Contents

**MEMORANDUM OF POINTS AND AUTHORITY**................................1

**I.    INTRODUCTION**.................................................1

**II.   FACTUAL AND PROCEDURAL BACKGROUND**............................2

    **A.    2011-2017: Defendant Convicted of Six Crimes**............2

    **B.    Defendant Joins the Rise Above Movement as a Militant Wing of a White Nationalist Group**........................3

    **C.    Defendant and his Co-Conspirators Commit Violence at Various Rallies**.......................................4

        1.    Huntington Beach....................................5

        2.    Berkeley............................................8

        3.    San Bernardino.....................................12

        4.    Charlottesville....................................13

    **D.    Defendant Has Never Accepted Responsibility and Testified Dishonestly at Trial**...........................16

**III.   PROBATION'S PRESENTENCE REPORT AND RECOMMENDATION**.......17

**IV.   A 52-MONTH SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACCOMPLISH THE ENUMERATED GOALS OF 18 U.S.C. § 3553**..17

    **A.    The Nature, Circumstances, and Seriousness of the Offenses**..............................................18

    **B.    Defendant's History and Characteristics**.................20

    **C.    The Need to Promote Respect for the Law, to Provide Just Punishment, and to Afford Adequate Deterrence**......22

    **D.    The Need to Avoid Unwarranted Sentencing Disparities**....22

**V.    CONCLUSION**................................................23

## MEMORANDUM OF POINTS AND AUTHORITY

**I.    INTRODUCTION**

Defendant Robert Boman ("defendant") actively participated in the Rise Above Movement ("RAM"), a militant white supremacist group whose members traveled to public rallies in California and Virginia throughout 2017, where they carried out violent assaults against those they perceived as their ideological opponents.  Defendant trained with his co-conspirators to commit violence, planned his violence, traveled to rallies planning to commit violence, initiated and committed violence, and bragged about his and his co-conspirators' violence in social media posts to celebrate their acts and to recruit more RAM members.  For his conduct, a jury found defendant guilty of one count of conspiracy to riot, in violation of 18 U.S.C. § 371, and one count of rioting, in violation of 18 U.S.C. § 2101, § 2.

The government agrees with U.S. Probation and Pretrial Services ("Probation")'s calculation of defendant's Guideline range as 46 to 57 months' imprisonment.  (Dkt. 517, Presentence Report ("PSR").) The government disagrees, however, with Probation's recommendation to impose a downward variance and a sentence of 36 months' imprisonment.  (Dkt. 516, Probation's Recommendation Letter.) Instead, the government recommends the Court impose a mid-range sentence of 52 months' imprisonment, followed by two years of supervised release.  Probation's recommended 10-month downward variance based on defendant's "demonstrable rehabilitation and lack of criminal conduct since achieving sobriety" is unwarranted.  (Id. at 6.)

Defendant's criminal conduct in this case was neither an aberration nor the product of drug addiction.  Between 2013 and 2023, defendant sustained more than a dozen criminal convictions, including for violent crimes such as grand theft, second-degree robbery, and assault on a peace officer.  Before committing the crimes in this case, defendant developed and promoted his violent neo-Nazi ideology for years.  He recruited others to join RAM, and then he and his fellow RAM members committed violent criminal conduct to further their antisemitic, racist ideology.

In the years since he committed the crimes in this case, he has shown no remorse.  On the contrary, he presented patently false testimony at trial to minimize his conduct and ideology.  And while he has recently achieved a period of sobriety, after his initial release in this case in 2018, he continued his decade-long string of criminal activity, sustaining several additional arrests and convictions between his release in 2018 and his re-arrest in this case in 2022.  Defendant's Guideline range is rightfully increased as a result of his significant criminal history, and his recent period of sobriety does not warrant varying from that range.  Based on the totality of the facts, the government respectfully requests that the Court sentence defendant to 52 months' imprisonment, a term of two years of supervised release, and a $100 mandatory special assessment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    2011-2017: Defendant Convicted of Six Crimes

In the six years before defendant joined RAM, he was convicted of six different crimes.  After sustaining juvenile convictions for battery and vandalism, defendant turned 18 years old in 2011 and

2

promptly sustained a felony conviction for grand theft from a person and was sentenced to 270 days in jail and 5 years' probation. (PSR ¶¶ 63-67.) While on probation, defendant sustained a conviction for petty theft and was sentenced to 8 days in jail and 3 years' probation. (Id. ¶ 68.) While on probation for both of those cases, defendant sustained another felony conviction for second degree robbery and was sentenced to 2 years' prison. (Id. ¶ 69.) In 2015, not long after his release from prison, defendant was convicted of obstructing a police officer and sentenced to 55 days in jail and another term of three years' probation. (Id. ¶ 70.) Less than a year later, in May 2016, and again while on probation, defendant was convicted of assault on a peace officer and sentenced to another 30 days in jail. (Id. ¶ 71.) One month after that, in June 2016, he was convicted of contempt for disobeying a court order and sentenced to 45 days in jail. (Id. ¶ 72.)

**B.   Defendant Joins the Rise Above Movement as a Militant Wing of a White Nationalist Group**

Shortly after his release from jail, in early 2017, defendant joined the Rise Above Movement ("RAM"). RAM represented itself publicly as a combat-ready, militant group of a new nationalist white supremacy and identity movement. (PSR ¶¶ 20-21.) RAM regularly held hand-to-hand and other combat training to prepare to engage in violent confrontations with protestors and other individuals at political rallies. (PSR ¶ 21.) For example, as defendant stated in a Facebook message: "We [train] just about every weekend. Have been for the last month. . . ." (Gov. Trial Ex. 78.)

On various social media platforms, defendant and his co-conspirators posted messages and photographs of themselves preparing

for or engaging in violence, accompanied by statements such as "When the squad's not out smashing commies," "#rightwingdeathsquad," and "#goodnightleftside."  (PSR ¶ 22.)  RAM would often post photographs of its members with their faces partially concealed in black skull masks, such as the photograph below from RAM's Twitter account, the same black skull masks that they would wear during their violent attacks at political rallies, such as at Berkeley and San Bernardino.



C.   **Defendant and his Co-Conspirators Commit Violence at Various Rallies**

As part of their membership in RAM, defendant and his co-conspirators agreed to attend rallies with the intent to provoke and engage in violent physical conflicts.  (PSR ¶ 21.)  As defendant's co-conspirator and one of RAM's founders, Benjamin Daley ("Daley"), later admitted, following these events, RAM would use their violence as a recruitment tool.  (Dkt. 442, Gov. Sent. Memo Def. Rundo, Ex. 3 at 3.)  For example, RAM maintained a Twitter account which posted videos and photographs of RAM members conducting training in hand-to-hand combat, often interspersed with video clips of RAM members assaulting people at political events with their faces partially

obscured by black skull or American flag masks.  (PSR ¶ 21.)
Defendant personally appeared in several of those videos and
photographs.  (Id.)

### 1.  Huntington Beach

In March 2017, defendant and his co-conspirators attended a
political rally in Huntington Beach, California.  (PSR ¶ 24.)  Ten
days before the event, defendant attended a RAM combat training
session in preparation to engage in violence at the rally.  (PSR
¶ 23.)

At the rally, RAM members carried signs, including one that
read "Defend America" and one that defendant carried that read "Da
Goyim Know," a phrase used by white supremacist extremists referring
to their supposed knowledge of a Jewish conspiracy to control world
affairs.[1]  (PSR ¶ 24.)  Throughout the morning, attendees engaged in
various peaceful activities, including chanting and making speeches.
(Dkt. 1 ("Compl.") ¶ 20.)  As those activities were ongoing, a small
group of protestors gathered nearby on the beach.  (Id.)  Defendant
and his co-conspirators did not join the hundreds of rally attendees
marching south along the beach, but instead broke away from the
group and confronted the protestors.  (Id. ¶ 21; PSR ¶ 24.)  Rally
attendees confronted, pushed, and then punched a journalist and a
college student journalism intern from a local news publication.
(Compl. ¶ 22.)  As one of the journalists stumbled backward,
defendant's co-conspirator, Tyler Laube ("Laube"), grabbed the
student's shoulder with his left hand and punched the student three

---

[1] The Goyim Know, Shut It Down, ANTI-DEFAMATION LEAGUE, available
at https://www.adl.org/resources/hate-symbol/goyim-knowshut-it-down
(last visited Jul. 18, 2025).

times in the face.[2]   (Id.; PSR ¶ 25.)  A protestor released pepper
spray, leading the crowd to momentarily disperse. (Id.; PSR ¶ 24.)

Several protestors then turned away from the group of rally
attendees and headed north along the beach.  (Compl. ¶ 23.)  A small
group led by defendant and his co-conspirators Robert Rundo
("Rundo"), Daley, and Laube pursued them.  Defendant caught up to
one of the protestors and kicked him in the back, as seen in the
photograph below on the left.  (Id. ¶ 24; PSR ¶ 25.)  A second
protestor turned and approached Daley, who shoved the protestor in
response.  (Compl. ¶ 25.)  The protestors continued walking north,
away from the RAM members, as defendant and his co-conspirators
continued pursuing them.  (Id.)  Another rally attendee walking
alongside the RAM members approached one of the protestors and
punched him in the face, knocking him to the ground.  (Id.)

 

Moments later, defendant's co-conspirator Rundo approached
another protestor from behind and punched him in the back of the
head.  (Id. ¶ 26.)  Defendant ran up behind Rundo toward the
protestor but turned back after a second protestor released pepper

---

[2] Laube later admitted that he and his associates assaulted
counter-protestors and that he intentionally and willfully
intimidated and interfered with the journalist by punching the
journalist several times in the head and body.  (Dkt. 262, Laube
Plea Agreement ¶ 9.)

spray.  (Id.)  Rundo then turned to the second protestor, punched him in the back of the head, grabbed the back of his neck, and threw him to the ground, landing on top of him.  (Id.)  As shown in the above picture on the right, Rundo then held the protestor down with his left hand and threw several punches with his fist and elbow at the protestor's head while other RAM members looked on, cheered, and prevented others from intervening.  (Id.)  After several seconds, a protestor again released pepper spray, leading Rundo to back away. (Id. ¶ 27.)  The protestor then ran northeast into a parking lot while other rally attendees pursued him, pushing him and hitting him with flag poles.  (Id.)  According to testimony at trial by the then-college student intern who was punched by Laube, another RAM member pursued the protestor and threw a large rock at him, striking him in the chest.  Laube and the other RAM member, then, followed the intern and protestor, yelling racist slurs at the student.

Defendant and his co-conspirators viewed the event as a success.  As co-conspirator Rundo noted: "I think it all worked out pretty well in Huntington[.]"  (Rundo Revised PSR, Dkt. 455 ("Rundo PSR"), ¶ 24.)  Defendant and his co-conspirators celebrated the assaults over social media.  (PSR ¶ 26.)  For example, defendant posted to his Facebook page a Daily Stormer[3] article titled "Trumpenkriegers Physically Remove Antifa Homos in Huntington Beach," commenting: "We did it fam."  (Id.; Compl. ¶ 29.)  As shown below, RAM's Instagram account posted a photograph showing Rundo

---

[3] The Daily Stormer is a news website and online community forum that is well known among neo-Nazis and white supremacist extremists. (Dkt. 392-2 at 221); See also Andrew Anglin, SPLC, available at https://www.splcenter.org/resources/extremist-files/andrew-anglin/ (last visited Jul. 18, 2025).

punching a counter-protestor from behind with the words "Physical Removal" superimposed across the photo. (Compl. ¶ 30.) And in February 2018, the RAM Twitter account posted a photograph showing several RAM members at the Huntington Beach rally with the message: "Shortly after this pic antifa was btfo [blown the fu*k out] in Huntington Beach." (Rundo PSR ¶ 31.) Daley posted yet another message stating, "[W]e had a blast physically removing them from Huntington [and we] will be at the Berkeley event." (Gov. Trial Ex. 3 at 1-2.)



2. <u>Berkeley</u>

Shortly after the Huntington Beach rally, defendant and his RAM associates began preparing for an unpermitted "Free Speech" demonstration at a public park in Berkeley, California. In advance of the event, co-conspirator Rundo talked to an associate about the need to "get more serious" with training sessions, including getting people to train "more than one day a week." (Rundo PSR ¶ 27.) They did just that; defendant and his co-conspirators trained on April 9, 2017, to practice hand-to-hand combat and formation fighting. (PSR ¶ 27.) Several days later, defendant and his co-conspirators rented

a van and drove approximately 400 miles together to northern California to participate in the rally.  (Id. ¶ 28.)



On April 15, 2017, defendant and his co-conspirators showed up to the rally in Berkeley with their faces partially obscured by black skull masks and their hands taped in a manner of boxers or martial arts fighters, as seen in the photograph of defendant here. (Compl. ¶ 37; Gov. Sent. Memo Def. Rundo, Ex. 11 at 1-3; Gov. Trial Ex. 187.)

At the rally, there were various violent clashes between opposing groups throughout the day.  (PSR ¶ 29.)  As a police officer on the ground noted, RAM was not "attempting to defend speakers," but was rather "on the frontline of the Right-side instigating the violence against the Left-side."  (Gov. Sent. Memo Def. Rundo, Ex. 4 at 1.)  In one such instance, defendant and his co-conspirators crossed the barrier that police had erected to separate the opposing groups and punched and kicked several people.  (Id., Ex. 11 at 4-5; PSR ¶ 29.)  Defendant, Rundo, and Daley attempted to pull away a flag held by several counter-protestors.  (Compl. ¶ 39.)  As officers testified at trial, after one counter-protestor fell to the ground, co-conspirator Rundo began throwing punches at multiple people, including punching one defenseless person repeatedly in the head.  (Id.; Dkt. 433, Rundo Plea Agreement ¶ 9.)  When a police officer tried to subdue Rundo, he resisted and punched the officer twice in the head before officers arrested him.  (Compl. ¶ 39.)  After Rundo was taken into custody, defendant and his co-conspirators continued to climb over

barricades and hit and kick counter-protestors, eventually chasing them out of the park through the streets chanting "hey, hey, hey, goodbye." (Id. ¶ 40.) Reflecting on the event afterwards, another police officer observed that "[t]hroughout the day, the RAM group would antagonize and then fight with counter-protestors. On multiple occasions, they would pick a person and then go after the person as a group, pulling the person out, isolat[ing] them, and then attacking them." (Gov. Sent. Memo Def. Rundo, Ex. 4 at 4.) As seen in the evidence presented at trial, as well as the below photos, throughout the day, defendant punched, slapped, and kneed several different protestors. (See Gov. Trial Exs. 183, 201, 218, 222, 226, 228.)

  

As they did after the Huntington Beach rally, defendant and his co-conspirators publicly celebrated their violence in Berkeley, posting photographs and videos of their assaults to social media and lauding their own violent exploits. (PSR ¶ 31.) For example, defendant posted a photograph on his Facebook page showing him punching a person at the Berkeley rally along with the caption "Ooooi vey!!! Dagoyiiim knooooow." (Id.) Later that same date, defendant posted a photograph on his Facebook containing a Twitter post in which a journalist identified defendant and Rundo at the

Berkely rally and accusing them of shoving him, to which defendant responded: "You come face to face with the enemy, what do you expect." (Id.)

In one conversation the day after the protest, a RAM member wrote to another describing how "our guys were just wrecking them, like not even any room to get a hit in," and how he had "found a video on that site where you can see me breaking [my hand] on a guys head lol." (Compl. ¶ 43.) The other RAM member responded, "I've been looking at videos. There's a grey-shirted storm trooper at the fucking front every, single, time." (Id.) The first RAM member agreed: "Total Aryan victory." (Id.) In January 2018, the RAM Twitter account posted a message describing itself as "the only alt right crew that actually beats antifa senseless and wins rallies." (Gov. Sent. Memo Def. Rundo, Ex. 3 at 4.) The following month, the RAM Gab account posted a photograph of a RAM member punching a protestor at the rally with the caption: "Talk shit get hit!" (PSR ¶ 33.) As Daley later admitted, RAM celebrated the media coverage and used the internet to post photographs and videos of assaults committed by RAM members to recruit members to engage in violent confrontations at future events. (Gov. Sent. Memo Def. Rundo, Ex. 3 at 4.) Rundo similarly bragged to a podcaster seeking to interview RAM leaders about Berkeley: "Maybe if there [is] enough time could mention [Berkeley] how we [RAM] were the first guys to jump over the barrier and engage and . . . that had a huge impact." (Compl. ¶ 45.)

3.    San Bernardino[4]

In June 2017, although defendant did not attend, his RAM members attended an "Anti-Islamic Law" rally in San Bernardino, California.  (Compl. ¶ 49; Rundo PSR ¶ 35.)  Leading up to the event, Daley sent a Facebook message to an associate that he and 30 others were planning to "take over" the upcoming march.  (Dkt. 47 at 8.)  As shown in the below screenshot from a RAM promotional video, RAM members once again arrived at the rally with their faces covered in the black skull masks and their knuckles taped.





At the rally, while hundreds of attendees marched peacefully, defendant's RAM co-conspirators violently confronted and pursued a group of counter-protestors who were standing on an opposite street corner.  (Rundo Plea Agreement ¶ 9; Compl. ¶ 49.)  As defendant's co-conspirators began to harass the counter-protestors, the rally

_____

[4] The PSR does not mention the events of San Bernardino or Charlottesville.  Although defendant was not personally at these events, he was convicted of conspiracy to riot, which included these events.

organizer contacted police providing security at the rally and said that a group of young men who were not part of her group, and whom she believed were white supremacists (later identified as RAM), were "acting aggressively toward the counter protestors." (Gov. Sent. Memo Def. Rundo, Ex. 10 at 1.)  According to a police officer on scene, on several occasions, police saw RAM members "walking aggressively toward the counter protestors in an apparent attempt to provoke and intimidate them." (Id.)  The counter-protestors sought police protection as they tried to leave the area and the officers saw RAM members running across the street, "chasing counter protestors to their vehicles," and "hitting their vehicles with flag poles." (Id. at 1-2.)  Officers arrested three individuals, all of whom were wearing the distinctive RAM black skull masks.

Afterwards, Daley texted an associate: "We smashed some antifa as they were leaving." (Compl. ¶ 49.)  The associate responded: "If it wasn't for the White Nationalists nothing would ever get done." (Id.)  Daley responded: "this is true would've been no victory in Huntington or Berkeley." (Id.)  Rundo confirmed Daley's account of the rally in separate messages.  When an associate asked Rundo if he had filmed his activities at the San Bernardino rally, Rundo wrote: "some girl got us smashing the antifa car and chaseing [sic] then [sic]." (Rundo Plea Agreement ¶ 9.)  Rundo added: "the next time I will get someone to film for us to get all the action." (Id.)

### 4. Charlottesville

As shown below, between August 11 and 12, 2017, several RAM members, not including defendant, attended the "Unite the Right" rally in Charlottesville, Virginia.  As with the previous rallies, the RAM members who attended did so expecting that they would engage

in violent confrontations with counter-protestors.  (Gov. Sent. Memo
Def. Rundo, Ex. 3 at 4.)  In advance of the rally, Daley posted on a
public platform for Charlottesville attendees that he and his co-
conspirators were "experienced at these events" and that "all were
in [the] Berkeley riots," bragging in a separate message that one of
the RAM members with them was an "excellent fighter" and that Daley
was "[s]toked to have him with us."  (Id. at 4-5.)  When an online
group discussed whether or not the event was permitted, Daley wrote:
"I'm flying out from CA with a handful regardless [of whether the
group had a permit].  Fuck these jews." (Compl. ¶ 51.)



     At the rally, defendant's co-conspirators, representing RAM,
once again committed multiple violent acts over the course of two
days, consistent with their training and preparation.  In one
instance, the RAM members attacked a group of students holding a
banner rejecting white supremacy.  (Gov. Sent. Memo Def. Rundo, Ex.
3 at 5.)  The following day, and as shown below, RAM attacked
counter-protestors so violently they left them bleeding in the
street.  (Id.)



Based on their conduct on behalf of RAM in Huntington Beach, Berkeley, and Charlottesville, Daley and the other RAM members who attended the Charlottesville rally later pleaded guilty in the Western District of Virginia to conspiracy to riot; they received sentences between 27 and 37 months' imprisonment.  (United States v. Daley et al., No. 3:18-cr-00025-NKM-JCH (W.D. Va. Jul. 19, 2019) Dkts. 149-153, 157-163.)  As defendant's co-conspirators admitted in their plea agreements, they went to each of these events with the intent to engage in violence and carried out violent assaults which were not in self-defense.  (Daley, Dkts. 59, 99, 108, and 111.)

In the immediate aftermath of the Unite the Right event, Rundo took steps to distance RAM from the Unite the Right event in the media.  For example, shortly after the event, Rundo messaged a co-conspirator: "Take Down any cville stuff off twitter and any pics of me."  (Rundo PSR ¶ 28.)  But neither Rundo nor RAM slowed down on training or recruitment efforts.  The month after the Unite the Right event, the RAM Twitter account posted a picture of Rundo and another RAM member assaulting counter-protestors at the Berkeley rally with the accompanying text: "#antiantifa #goodnightleftside #riseabovemovement."  (Compl. ¶ 54.)  In November 2017, RAM created

a promotional video which combined videos of defendant and other RAM members assaulting counter-protestors with photographs and videos of RAM members training in hand-to-hand combat.  (Id. ¶ 56.)  In January 2018, the RAM Twitter account wrote: "What's up with giving a shoutout to the only alt right crew that actually beats antifa senseless and wins rallies."  (Id. ¶ 57.)

### D.    Defendant Has Never Accepted Responsibility and Testified Dishonestly at Trial

In the approximately eight years since defendant's commission of the crimes, he has never accepted responsibility for his actions. In fact, during defendant's jury trial, he testified dishonestly in an attempt to justify and minimize his conduct.  He testified that



he went to Berkeley to provide "security" for the speakers and not with the intent to fight "everybody" there.  But as the evidence showed and the jury found, he did in fact travel to Berkeley with the intent to riot. He also testified that he didn't attend the Unite the Right rally in Charlottesville, Virginia because he didn't support its message and it was "too racist."  That claim was patently false.  Defendant had for months publicly promoted violent antisemitic and racist ideology.  And the very night of the Unite the Right rally, he posted to Facebook a horrific, gory, racist, antisemitic photo, as seen here.  (Gov. Trial Ex. 152.)

16

**III. PROBATION'S PRESENTENCE REPORT AND RECOMMENDATION**

The government agrees with Probation's Guideline calculation, including a base offense level of 14 under U.S.S.G. § 2A2.2(a) and a two-level increase for more than minimal planning under U.S.S.G. § 2A2.2(b)(1). (PSR ¶¶ 44-46.) The government further agrees that Probation correctly calculated defendant's total offense level as 16 and his criminal history category as VI, resulting in a Guideline range of 46 to 57 months' imprisonment and a term of one to three years supervised release. (Id. ¶¶ 44-80, 144, 146-148.) The government, however, as discussed below, respectfully disagrees with Probation's recommended sentence. Citing the history and needs of defendant, including his "demonstrable rehabilitation and lack of criminal conduct since achieving sobriety," the Probation Office recommends a variance such that defendant be sentenced to a 36-month term of imprisonment and two years of supervised release. (Recommendation at 1-2, 5-6.)

**IV. A 52-MONTH SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACCOMPLISH THE ENUMERATED GOALS OF 18 U.S.C. § 3553**

A 52-month imprisonment sentence is sufficient but not greater than necessary to account for the factors enumerated in 18 U.S.C. § 3553, including the nature and circumstances of the offense, defendant's history and characteristics, the need to promote respect for the law, the need to provide a just punishment for the offenses, the need to afford adequate deterrence, and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Based on the factors set forth above, and as described below, the downward

variance to 36 months proposed by the Probation Office is not warranted.

### A.    The Nature, Circumstances, and Seriousness of the Offenses

The nature and circumstances of the offenses warrant a 52-month sentence.  Defendant trained for violence, committed numerous acts of violence, and then bragged about his violence online.  He and his co-conspirators attended public protests not for the purpose of engaging in constitutionally protected speech, but to engage in physical assaults and drive out those with whom they disagreed or disliked.  As police officers who were at those rallies testified at trial, defendant and his co-conspirators would repeatedly antagonize and then fight with protestors, picking individuals out, isolating them, and then physically attacking them.  As the officers observed, and the video evidence showed, defendant and his co-conspirators did not act defensively, but rather charged over the barricades (erected by police to separate the protestors and counter-protestors) to attack protestors.

As the video evidence showed and witnesses testified at trial, at Huntington Beach, defendant kicked a protestor in the back.  Defendant's co-conspirator Laube repeatedly punched a college intern in the head and later in the day with another RAM co-conspirator followed that intern yelling racist slurs at the intern.  Defendant's co-conspirator Rundo tackled a protestor to the ground, repeatedly punching and elbowing him in the head.  Yet another one of defendant's conspirators threw a rock at a protestor hitting him in the chest.  Defendant and his conspirators saw this event as a victory, as they celebrated their violence online by posting pictures and messages, including defendant posting, "we did it fam"

18

and Daley posting, "we had a blast physically removing them from Huntington [and we] will be at the Berkeley event."

Defendant and his conspirators saw their Huntington Beach violence as a success and immediately started planning their next attacks. Less than a couple weeks after Huntington, they were again training in hand-to-hand combat and formation fighting and planning their trip several hundred miles to Northern California. As police officers at trial testified, the event on April 15, 2017, in Berkeley, California, turned into a massive riot with fights involving hundreds of people spilling out into the street over several blocks. However, contrary to defendant's testimony that he and his RAM members were there to provide "security" for the speakers, they were wearing black skull masks, had their hands taped or wrapped like boxers, charged over the barricade to initiate violence, repeatedly attacked people, re-initiated the violence after lulls in the fights, and fought in an organized formation. In fact, throughout the day, defendant punched, slapped, and kneed at least seven different people. He and his RAM conspirators chased people through the streets and turned what should have been public demonstrations into public street fights to be won through coordinated group violence.

After the Berkeley event, defendant and his conspirators yet again bragged about their violent assaults with pictures and messages on social media. Defendant changed his Facebook profile to a picture of him at Berkeley, wearing the distinctive black skull mask and his hands wrapped and held up in a boxing stance. He also responded to a journalist's online post complaining that defendant pushed him, by stating, "You come face to face with the enemy, what

19

do you expect."  Another RAM member bragged that they "were just
wrecking them" and "breaking [my hand] on a guys head lol."  The RAM
Twitter account bragged: "the only alt right crew that actually
beats antifa senseless and wins rallies."  They also glorified their
attacks in promotional videos to recruit more members and plan for
more events.

Defendant's conspirators continued their violence in San
Bernardino and Charlottesville.  At each event, defendant's
conspirators again violently attacked protestors and then afterward
bragged: "[we] smashed some antifa as they were leaving"; if it
weren't for the "White Nationalists" there wouldn't have been a
"victory in Huntington or Berkeley"; and "fuck these jews."  While
defendant did not personally attend the San Bernardino and
Charlottesville events, he continued espousing violent, antisemitic,
racist ideology online, and he was found guilty by a jury for
conspiring to riot including at these events.  As Probation
correctly notes, defendant's "affiliations with RAM [are]
concerning."  (Recommendation at 5.)  Both defendant's individual
conduct and that of his conspirators throughout all four of these
events and online must be taken into account.  The nature,
circumstances, and seriousness of defendant's and his conspirators'
actions in conspiring to riot and in rioting, including their
violent actions, violent White Supremacist ideology, more than
minimal planning to execute their violence, and repeated violence,
are serious and warrant a 52-month custodial sentence.

**B.   Defendant's History and Characteristics**

A sentence of 52 months' imprisonment is also sufficient but
not greater than necessary to account for defendant's history and

characteristics.  The crimes in this case were not an isolated incident; they were an escalation of a nearly unbroken years-long string of crimes that defendant committed.  As described above, defendant has an extensive criminal history, including grand theft from a person, robbery, and obstructing and assaulting police officers.  Also as explained above, in the over eight years since the commission of the current offenses in 2017, defendant has never accepted responsibility, but rather has continued committing numerous crimes and testified dishonestly.

Probation notes defendant's historic struggles with substance abuse, his recent sobriety in 2022, and his recent employment in 2025.  (PSR ¶¶ 110-120, 127-132, 135-136.)  Although defendant's sobriety, employment, and lack of additional crimes since sobriety are commendable, they do not warrant a 10-month variance.  Rather, those mitigating factors factor into the government's recommended mid-range sentence, which balances the many aggravating factors as described herein, including the seriousness of the offenses; defendant's lengthy criminal history; defendant's lengthy violent, antisemitic, racist ideology that fueled his serious convictions; need to promote respect for the law for a defendant who has continually violated the law for a decade and has not taken responsibility for his current convictions; need for deterrence to both this defendant and others; and need to avoid unwarranted sentencing disparities.  Defendant's two years of living a crime-free life and six months of full-time employment (again, while commendable) compared to the decade of committing crimes and disrespecting the law, as well as never accepting responsibility for his current offenses, warrants a mid-range sentence as opposed to a

high-end sentence, not a 10-month downward variance below the
guideline range.  A 52-month sentence properly balances the many
aggravating factors against the mitigating information in
defendant's personal history.

**C.    The Need to Promote Respect for the Law, to Provide Just Punishment, and to Afford Adequate Deterrence**

A 52-month sentence is also necessary to promote respect for
the law, to provide just punishment for defendant's offenses, and to
afford adequate deterrence.  Defendant has never accepted
responsibility for his actions.  Defendant has continued committing
crimes for a decade, including during and after the commission of
the instant offenses.  Defendant testified untruthfully about his
current conduct.  To afford him a downward variance will do little
to promote respect for the law, to provide just punishment for his
crimes, and to deter him from continuing to disrespect the law and
commit crimes.

**D.    The Need to Avoid Unwarranted Sentencing Disparities**

Finally, a sentence of 52 months' imprisonment would avoid an
unwarranted sentencing disparity between this and other defendants
with similar records who have been convicted of similar conduct.
Based on their violence at events they attended with defendant in
California, as well as the violence they inflicted in
Charlottesville, defendant's co-conspirators received custodial
sentences of 27 months (Michael Miselis), 33 months (Thomas Gillen),
37 months (Daley), and Cole White (time-served) in the District of
Western Virginia.  Additionally, co-defendants in this case received
custodial sentences of 24 months (Rundo) and time-served (Laube).
However, all these co-conspirators/defendants accepted

responsibility, unlike defendant.  And, all these co-conspirators/defendants had criminal history categories of IV or less, unlike defendant who has a criminal history category of VI. Additionally, co-defendant Rundo spent an additional approximately four months in custody in Romania.  Given defendant's criminal history and lack of acceptance of responsibility, a downward variance to 36 months would create an unwarranted disparity.

**V. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 52 months' imprisonment, two years of supervised release, and a $100 special assessment.